UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
──────────────────────────────────X
RAM DISTRIBUTION GROUP, LLC
doing business as TAL DEPOT,

                       Appellant,

      -against-

JOSEPH GUNNAR & CO., LLC,

                       Appellee.
──────────────────────────────────X

For Online Publication Only

**FILED**
**CLERK**
3:11 pm, Sep 29, 2023
**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**ORDER**
22-CV-5247 (JMA)

**AZRACK, United States District Judge:**

Appellant Ram Distribution Group, LLC, doing business as Tal Depot ("Appellant" or "Ram"), the debtor in this Chapter 11 bankruptcy case, appeals from a February 25, 2022 Order (the "Bankruptcy Court Order") of Judge Louis A. Scarcella of the United States Bankruptcy Court for the Eastern District of New York (the "Bankruptcy Court") granting Appellee Joseph Gunnar & Co., LLC's ("Appellee" or "Joseph Gunnar") motion to dismiss Appellant's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (Bankruptcy Court Order, ECF No. 1-3; see Ram Distribution Group LLC dba Tal Depot v. Joseph Gunnar & Co., LLC, Bankr. No. 8-20-08081, ECF No. 31.) For the reasons set forth below, the Bankruptcy Court Order is **AFFIRMED**.

### I. BACKGROUND

The Court assumes the parties' familiarity with this action's facts and procedural history, and summarizes only the relevant, undisputed facts and history relevant to the instant appeal.

**A. The Parties' Introduction**

Appellant is an online grocer that sells nonperishable groceries on its own website and on third-party seller websites. (Compl. ¶ 1.) Appellant began its business in 2012 and annual

revenues grew from $250,000 in 2012 to $35 million in 2018.  (Id. ¶ 9.)  In the last quarter of 2016, Appellant began looking to secure expansion funding.  (Id.)

The parties were introduced in or about December 2016, at which point Appellant's President and Chief Executive Officer, Jeremy Reichman, began communicating with Appellee's representatives, including Ramnarain Jaigobind ("Jaigobind").  (Id. ¶ 11.)  After meeting, Appellee advised that Appellant's best option to secure expansion funding was by an initial public offering ("IPO").  (Id.)  Appellant further asserts that Appellee represented that it could obtain a $75 million valuation for Appellant, and that Jaigobind would both:  (1) lead the team of bankers on the IPO; and (2) could secure interim bridge financing for Appellant during the IPO process.  (Id.)

**B. The Engagement Letter**

This agreement was set forth in an engagement letter (the "Letter"), which was executed on or about January 6, 2017.  (See Compl. ¶ 12; see also Compl., Ex. A.)  Through the Letter, Appellee pledged to both:  (1) act as Appellant's "exclusive financial advisor, sole book-runner, sole underwriter and sole investment banker in connection with the proposed Offering or any other public financing"; and (2) use its "best efforts, consistent with customary practice, during the Engagement Period to provide all investment banking services customarily provided in connection with transactions such as the proposed Offering."  (See Letter ¶ 1.)  Paragraph 12 of the Letter provides that Paragraphs 1, 12-14, 17-18, and 20 "are intended to be legally binding and enforceable on and against [the parties]."  (Id. ¶ 12(a).)

Paragraph 12(b) sets forth post-termination procedures.  Under the Letter, if either party terminated its participation in the IPO process "after the 180-day anniversary of the execution of [the] engagement letter," Appellee was entitled to reimbursement of certain "expenses and fees," as well as the "full amount of its actual accountable expenses…up to a maximum of $100,000."

2

(Id. ¶ 12(b).) If Appellant terminated the Letter prior to the 180-day anniversary "for any reason," it was obligated to pay Appellee $100,000 "inclusive of actual accountable expenses incurred up to such termination date." (Id.) Under the Letter, Appellee would not be entitled to payment or reimbursement upon termination if: (i) Appellee terminated the Letter "prior to the execution of the Underwriting Agreement for other than Good Reason[1]"; or (2) Appellant terminated the Letter due to Appellee's "gross negligence or willful misconduct." (Id.)

Paragraph 1's first sentence and the entirety of Paragraph 12(b) of the Letter were amended by the parties via a letter agreement (the "Amendment") executed on or about October 19, 2017. (See Compl. Ex. B.) In pertinent part, the Amendment states that: (1) the engagement period runs from the date of the amended engagement letter to "the earlier of the consummation of the Offering or October 6, 2018, unless sooner terminated"; and (2) Appellant may not terminate the Letter until July 6, 2018, except for as otherwise provided in the engagement letter. (Id.) The Amendment did not otherwise modify payment or reimbursement to Appellee upon the Letter's termination. (See id.)

## C. The Parties' IPO Process

The IPO process lasted until the first quarter of 2018 – and was costly both financially and in terms of its use of plaintiff's personnel resources. (Compl. ¶¶ 19-22.) Jaigobind left Appellee's employ for another investment bank in or about February 2018 and, approximately two months later, was joined by other members of his former team who had worked on Appellant's IPO. (Id. ¶¶ 23, 30.) Moreover, in or about March 2018, Appellee purportedly lowered Appellant's valuation to $25 million, and on or about March 14, 2018, filed a required Form S-1 with that lower valuation. (Id. ¶ 24.) Appellee next insisted that, since it was already 2 months into 2018,

---

[1] "Good Reason" is defined under Section (c) of Paragraph 12 of the Letter.

Appellant's auditor should complete an audit for the first quarter of 2018 before completing the Form S-1.  (Id.)

On or about April 17, 2018, the SEC relayed to Appellant that it had no further comments on Appellant's Form S-1, thereby clearing the way for the presale process and roadshow to begin.  (Id. ¶ 26.)  Appellee's representative then contacted Appellant and urged Appellant to file a presentation that contained more concise and easy-to-read information about Appellant in a "free writing prospectus" to be used for the roadshow; Appellant did so.  (Id. ¶¶ 27-28.)  This filing signaled that Appellant "was ready to go public."  (Id. ¶ 29.)  Appellant thereafter learned of the exodus of Jaigobind and his team.  (Id. ¶ 30.)

Post-exodus, Appellee apparently admitted that it was not able to engage in presale activities, arrange meetings with investors, or go on roadshows "because [Appellee] had no representatives to work on any tasks with the loss of the entire team it had working on the IPO." (Id.)  Appellant requested that Appellee allow it to search for and retain another bank, a request that Appellee refused to grant without Appellant paying Appellee the $100,000 to which Appellee was entitled under the Letter's termination clause.  (Id. ¶ 34; see also Letter ¶ 12(b).)

**D. Appellant's Bankruptcy Filing and the Parties' Adversary Proceeding**

Based on the above, Appellant filed a petition for relief under chapter 11 of the Bankruptcy Code on April 12, 2019.  (See Bankruptcy ECF No. 1.)  The underlying adversary proceeding was commenced by Appellant's May 22, 2020 filing of its two-count Complaint, which asserted claims for:  (1) breach of contract; and (2) breach of the implied covenant of good faith and fair dealing.  (See Compl.)  The Complaint sought damages based on the loss of $33 million in revenue and its diminished valuation.  (Id. ¶¶ 38-39, 49-50.)  According to the Complaint, the "customary practice" of an investment bank during the IPO process includes "(a) engaging in the due diligence process,

4

(b) participating in the development of Form S-1 to be drafted, amended as necessary, and filed with the Securities and Exchange Commission (the 'SEC'), (c) preselling the offering and (d) conducting a roadshow." (Compl. ¶ 15.)

E. **Appellee's Motion to Dismiss and the Bankruptcy Court's Order**

Appellee's motion to dismiss the Complaint pursuant to Rule 12(b)(6) was fully briefed on or about October 5, 2020. (See ECF No. 4-1.) After reviewing the parties' papers, the Bankruptcy Court granted Appellee's motion in its entirety. (See generally Bankruptcy Court Order.) In dismissing Appellant's breach of contract claim, Judge Scarcella first determined that the Letter was unambiguous, finding that, based on Appellant's allegations, its "breach of contract claim turn[ed] on whether [Appellee] was obligated by the Letter" to provide the four categories of investment banking services alleged in the Complaint. (Id. at 12.) He next determined that, "[l]ooking within the four corners of the parties' agreement," Appellant "create[d], ostensibly from thin air, four distinct services that that are either not referenced in the Letter or contradicted by its terms altogether." (Id. at 12-13.) After dismissing Appellant's breach of contract claim, the Bankruptcy Court rejected Appellant's implied covenant of good faith and fair dealing claim—which was based on Appellant's alleged failure to release Appellee from the Letter even though the Letter contained detailed provisions concerning termination—on the grounds that it was duplicative of the breach of contract claim. (Id. at 20-22.) The Bankruptcy Court therefore dismissed the Complaint and gave Appellant 14 days to file an amended pleading. (Id. at 22.)

F. **Procedural History**

Notwithstanding the Bankruptcy Court Order, Appellant spurned the opportunity to submit an Amended Complaint, instead seeking permission (which was granted) for leave to appeal. (See ECF No. 1; September 1, 2022 Electronic Order.) Initially, Appellant argues – for the first time –

5

that the Letter is ambiguous and raises issues of fact that should have prevented the Bankruptcy Court from dismissing the Complaint, including that Appellee's "failure to use best efforts to perform" <u>all services</u> that are "customarily provided by investment bankers/financial advisors/book runners/underwriters in connection with an IPO" constituted a breach of the Letter. Moreover, Appellant argues that its good faith and fair dealing claim should not have been dismissed because it is based on facts that occurred after Appellee purportedly breached the Letter. Appellant's appeal was fully briefed as of February 6, 2023.  (<u>See</u> ECF Nos. 4, 7.)  For the reasons set forth below, the Bankruptcy Court Order is **AFFIRMED** and Appellant's appeal is **DENIED**.

## II. DISCUSSION

### A. <u>Legal Standard</u>

This Court has jurisdiction to hear appeals from bankruptcy courts under 28 U.S.C. § 158(a), which provides that "[t]he district courts of the United States shall have jurisdiction to hear appeals…from final judgments, orders, and decrees…[and] with leave of the court, from other interlocutory orders and decrees…of bankruptcy judges." 28 U.S.C. §§ 158(a)(1), (3).  District courts review a bankruptcy court's factual findings for clear error and its conclusions of law <u>de novo</u>.  <u>See</u> <u>In re Charter Commc'ns, Inc.</u>, 691 F.3d 476, 483 (2d Cir. 2012); <u>Washington v. Chapter 13 Tr.</u>, No. 19-cv-7028, 2020 WL 5077403, at *2 (E.D.N.Y. Aug. 26, 2020).

### B. <u>Analysis</u>

Here, Appellant claims that the Bankruptcy Court committed reversible error by dismissing Appellant's two-count Complaint in its entirety.  The Court disagrees and denies Ram's appeal.

> **1. <u>The Bankruptcy Court Did Not Err in Concluding that Appellant Failed to Adequately Plead a Claim for Breach of Contract</u>**

Ram initially contends that the Bankruptcy Court erred in dismissing its breach of contract claim.  Appellant argues – for the first time – that the Letter is ambiguous and raises issues of fact

6

that should have prevented the Bankruptcy Court from dismissing the Complaint. To state a claim for breach of contract under New York law, a plaintiff must allege four elements: "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." JJCC Real Estate LLC v. Brooklyn Renaissance, LLC (In re Brooklyn Renaissance, LLC), 556 B.R. 68, 75 (Bankr. E.D.N.Y. 2016) (quoting Harsco Corp. v. Segui, 91 F.3d 337, 348 (2d Cir. 1996)). A plaintiff alleging a breach of contract must identify "specific provisions of the contract upon which liability is predicated." Benihana of Tokyo, LLC v. Angelo, Gordon & Co., L.P., 259 F. Supp. 3d 16, 33 (S.D.N.Y. 2017) (internal citations omitted), aff'd, 712 F. App'x 85 (2d Cir. 2018) (summary order).

A district court may dismiss a breach of contract claim at the motion to dismiss stage only if the contract's material terms are unambiguous, see Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp., 830 F.3d 152, 156 (2d Cir. 2016), meaning courts evaluating such motions must first determine if such material terms are, in fact, unambiguous. Novartis Pharma AG v. Incyte Corp., 520 F. Supp. 3d 514, 525 (S.D.N.Y. 2021). This threshold determination requires courts to look only within the "four corners of the document, not to outside sources." JA Apparel Corp. v. Abboud, 568 F.3d 390, 396 (2d Cir. 2009). Extrinsic evidence may not be introduced to show the parties intended a meaning different from that which was expressed in the agreement. Novartis Pharma, 520 F. Supp. 3d at 524. Courts analyzing contractual ambiguity should apply the normal rules of interpretation and give a full and plain meaning to each provision's words and phrases. Kass v. Kass, 696 N.E.2d 174, 180 (N.Y. 1998). A contract is not ambiguous if its language has a "definite and precise meaning," and there is "no reasonable basis for a difference of opinion." Orchard Hill, 830 F.3d at 156. Finally, courts may neither utilize interpretations that render any terms or provisions meaningless or superfluous, Givati v. Air Techniques, Inc., 960 N.Y.S.2d 196,

7

198 (2d Dep't 2013), nor "write into a contract conditions the parties did not insert by adding or excising terms under the guise of construction," or "construe the language in such a way as would distort the contract's apparent meaning." Georgitsi Realty, LLC v. Penn-Star Ins. Co., 702 F.3d 152, 155 (2d Cir. 2012) (internal citations omitted).

With these principles in mind, the Court turns to Appellant's breach of contract claim, which the Bankruptcy Court rightly narrowed down to a single issue, namely whether the Letter obligated Appellee to undertake any, all, or none of the four tasks that Appellant claimed were specifically referenced in the Letter: "(a) engag[ing] in the due diligence process, (b) participat[ing] in the development of Form S-1 to be drafted, amended as necessary, and filed with the Securities and Exchange Commission (the 'SEC'), (c) presell[ing] the offering and (d) conduct[ing] a roadshow." (Compl. ¶ 15.) As a threshold matter, and because Appellant did not argue that the Letter is ambiguous, the Bankruptcy Court "glean[ed] the parties' intent 'from the four corners of the agreement.'" (Bankruptcy Court Order at 12 (quoting Fleming v. Fleming, 137 A.D. 3d 1206, 1207 (1st Dep't 2016); citing LaSalle Bank Nat'l Ass'n v. Nomura Asset Cap. Corp., 424 F. 3d 195, 208 n.10 (2d Cir. 2005))). In doing so, the Bankruptcy Court poignantly observed that, while the Letter sets forth several services which Appellee was obligated to provide to plaintiff in connection with the IPO process, Appellant's breach of contract claim does not argue that Appellee "failed to perform one of these enumerated services, or even allege which services [Appellee] wrongfully performed," and that Appellant instead "create[d], ostensibly from thin air, four distinct services that are either not referenced in the Letter or contradicted by its terms altogether. And it is on these four distinct services that [Appellant's] breach of contract action is premised." (Id. at 12-13.) The Court agrees.

8

The Bankruptcy Court did not err or improperly assess—as Appellant suggests—those services which Appellee was required to perform under the Letter. Indeed, after accepting as true Appellant's proffered factual allegations, the Bankruptcy Court first determined what Appellant alleged the Letter unambiguously required Appellee to do, and then proceeded to analyze whether Appellant properly pleaded that there was a breach of those specific contractual obligations.[2] See Angelo, Gordon & Co., L.P., 259 F. Supp. 3d at 33. The Bankruptcy Court's comprehensive analysis—which this Court need not rehash—reveals that the Letter did not obligate Appellee to perform any of the four services upon which Appellant's breach of contract claim is premised. (See Bankruptcy Court Order at 13-19.) Accordingly, the Court concludes that the Bankruptcy Court did not err in dismissing Appellant's breach of contract claim and denies Ram's appeal on this ground.

### 2. The Bankruptcy Court Did Not Err in Dismissing Appellant's Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing

Appellant next argues that the Bankruptcy Court erred by dismissing its claim for breach of the implied covenant of good faith and fair dealing. "Implicit in every contract is an implied covenant of good faith and fair dealing[,]" Gutierrez v. Gov't Emps. Ins. Co., 25 N.Y.S.3d 625, 627 (2d Dep't 2016), which is breached when a party acts in a manner that, although not expressly forbidden by the contractual provision, would deprive the other party of the benefits of the agreement. Sorenson v. Bridge Capital Corp., 861 N.Y.S.2d 280, 282 (1st Dep't 2008). Such a claim is "properly dismissed as duplicative of the breach of contract claim [when] both claims arise from the same facts." Logan Advisors, LLC v. Patriarch Partners, LLC, 879 N.Y.S.2d 463, 466 (1st Dep't 2009).

---

[2] Even if Appellant is correct in its position that the Bankruptcy Court did not explicitly state that the Letter and its terms were unambiguous, this conclusion can be inferred from the Bankruptcy Court's analysis of Appellant's factual allegations, and the comparison of those allegations to the Letter's explicit terms.

Here, the Bankruptcy Court dismissed Appellant's claim for breach of the covenant of good faith and fair dealing as duplicative of its breach of contract claim.  It noted that Appellant:  (1) conceded that the sole basis for its breach-of-covenant claim was Appellee's allegedly bad faith refusal to release Appellant from the restrictions of the Letter when it purportedly knew that it could no longer complete the IPO process; and (2) sought the same damages for both claims.  (See Bankruptcy Court Order at 20-21.)  Moreover, under the Letter, the Bankruptcy Court properly acknowledged that Appellee was entitled to $100,000 if Appellant terminated the Letter for any reason prior to July 6, 2018.  (Id.)  For these reasons, the Court concludes that the Bankruptcy Court acted reasonably in dismissing Appellant's breach-of-covenant claim.  See Deutsche Bank Nat'l Tr. Co. v. Quicken Loans Inc., 810 F.3d 861, 869 (2d Cir. 2015) (internal citations omitted).

Even assuming, arguendo, that the Bankruptcy Court's dismissal of Appellant's breach of an implied warranty claim could be called into question, the Court concludes that Appellant's reliance on legal authority for its proposition that the implied covenant is a distinct claim, the breach of which deprived Appellant of the "benefit of the bargain," is misplaced.  As set forth above, in addition to failing to plead Appellee's violation of the "spirit of the agreement," Appellant pointed to no material difference between its two claims; indeed, both were based upon the same conclusory allegations of Appellee's purported breach of the express terms of the Engagement Letter by, in bad faith, continuing (or refusing to terminate) the engagement when it knew or should have known it could not complete the IPO process.  Moreover, because the Letter governed Appellant's right to terminate the contract, Appellee's alleged refusal to release Appellant without the payment required by the Letter cannot give rise to a claim for breach of the implied covenant.  See Deutsche Bank, 810 F.3d at 869.  Accordingly, the Court concludes that the Bankruptcy Court did not err in dismissing Appellant's breach of implied covenant claim.

## **CONCLUSION**

For the foregoing reasons, the Bankruptcy Court's Order is **AFFIRMED** and Appellant's appeal is **DENIED**. The Clerk of the Court is respectfully directed to close the case.

**SO ORDERED.**

Dated:  September 29, 2023
         Central Islip, New York

_/s/ (JMA)_
JOAN M. AZRACK
UNITED STATES DISTRICT JUDGE
